My name is Guy Burns from Tampa, Florida, representing the plaintiff in the case below and the appellate herein, GLOBAL COMMUNICATIONS, we refer to as GLOBALCOM. I'm here with my co-counsel from Tallahassee, Wiley Horton. This case comes to the court after the grant by the District Court of a summary judgment that was based upon, we believe, a misinterpretation of this court's transcorps versus electronic transactions consultants case, and a misunderstanding and a misapplication of the doctrine of patent exhaustion. Counsel, before we start, the briefs that were filed in this case are heavily marked confidential information. Have you come to an agreement as to what we're to address in today's oral argument? Do we stay away from all of the yellow markings, which is most of the cases, most of the briefs? I don't know that we have specifically discussed that issue as to what we would be verbally arguing to the court, but my understanding would be that we would be free to argue everything in the briefs, including those things that are yellow. I think we agree with that, Your Honor. The summary judgment hearing, which is in the transcript, was not submitted under seal, and so you'll see that the portions of the agreement were pretty thoroughly ventilated there. Can we quote Section 8 and its parts or not? We have no objection to that. I believe you can, and I believe that that would be permissible. Now, after quanta, you've got to be pretty careful if you want to collect some of your royalty rents downstream from your settlement agreement, right? Don't you have to make that very explicit that you are reserving the right to continue to collect rent downstream, even though I've settled with you, the distributor? That may be a fair statement in a high-altitude level, and we think this agreement has done exactly that. You're going to have to show me how, because I'm trying to see where it obligates. I've read the 8B2 clause several times, and it talks about the shall not exceed 3%, but where is there an obligation for someone to even accept that rate? There is an obligation to get a license, and there's a cap placed on the rate that can be charged. Is there an obligation to get a license? Yes, Your Honor, there is. Show me that. They can offer a non-exclusive license, but where is there an obligation of someone to take the license? They can choose to not have manufactured and to not use single-wire equipment. They can choose to do that, but if they want to use single-wire equipment, they're obligated to conform with the 8B2 section. Does it even say that? Yes, it does, Your Honor. Help me understand. What the parties did in the 04 agreement, first of all, is they said, we're going to give you a fully paid-up license for the 930 patent equipment. And they also went on to say, as it relates to the single-wire equipment, we're going to treat that differently. And what they did was they gave a covenant. What do you mean by they? The party, Globalcom and DirecTV. Okay, you keep saying they. The parties to this litigation and to the contract in 2004 got together and they made an agreement as to a fully paid-up license for the 930 patents. And they made a separate agreement, a distinct agreement, as it relates to the single-wire patents. And what DirecTV agreed is that it would, that this covenant not to sue and to the extent that that granted any license would not cover the DirecTV supporting parties. But if the DirecTV supporting parties wanted to, and they include manufacturer, distribute, up and down the chain, they would be required to come back to Globalcom and get a license. And Globalcom agrees that we'll put a cap on that of 3%. So what was bargained for was the ability to get a license at a not-to-exceed price. You agree, don't you, that under no circumstances can Globalcom sue DirecTV for infringement? We believe that we can sue them for breach of this contract. For breach of the contract, but not for infringement. There's no ambiguity about that. They do have a covenant not to sue as it relates to that. But why is that simple fact alone not, in fact, dispositive? We don't have a conditional grant of freedom from suit. It is outright. So any questions about the role, the reach of QANTA on conditional authorizations of sale are not present? Well, DirecTV is not a party to this lawsuit. It's four distributors who are DirecTV supporting parties as defined in the contract. And so what DirecTV, what the whole basis of the Transcor case and the QANTRA case say is that for patent exhaustion to come into place, the initial sale has to be authorized. The initial sale in this case is the sale from the manufacturers to DirecTV. This case in Transcor... Not the initial, no, no, no, no. The relevant initial sale here is from DirecTV to... And that is a relevant initial sale because in Transcor this court goes on to say one cannot convey that which one does not have. So DirecTV goes to a manufacturer that's unlicensed, purchases equipment, and then DirecTV has and owns unlicensed equipment. Then DirecTV sells the unlicensed equipment to a distributor that we sue. And Section 8A authorizes that sale. No, it does not. It says we will never, ever sue you for infringement for making that decision. And what we're suing is we are suing four distributors who had unlicensed equipment that was never licensed that passed through the hands of DirecTV. So can DirecTV launder unlicensed equipment by buying it from someone who has been described in 8B2 as a manufacturer and needs a license and doesn't have one and sell it to a distributor that's a DirecTV supporting party that needs a license and doesn't have one? When these two parties could not do that directly between themselves, can they, by laundering that equipment through DirecTV, create effectively a patent exhaustion? So essentially what we have is a... That's how the industry works, isn't it? I mean, you have DirecTV who contracts with third parties and purchases equipment and they use the technology that they received under the license. Well, that's why the 2007 agreement is so critical to understand exactly how the parties intended this to work and how it did work. And in 2007, GlobalCom went to DirecTV and said, listen, you're practicing the single wire patent by having some things manufactured. And in 2007, what DirecTV did and that agreement and what DirecTV did was said, well, under Section 8D, we're the third party beneficiary of the 3% license cap agreement with the DirecTV supporting parties or that arrangement that was described. And we're going to go ahead and take a paid-up license for equipment manufactured up through December 31st of 2007. So DirecTV acknowledged by their actions in 2007 exactly the way they set up the 2004 agreement. And that is they, because they had DirecTV supporting parties manufacturing and distributing this equipment, DirecTV, who has admitted in their briefs that they never manufactured anything at any point in time, did exactly what the 2004 agreement contemplates. And that is they went out and paid money for a license for the DirecTV supporting parties to practice this patent. And they did that because they were third party beneficiaries under the Section 82B. And so we get back to the concept that the 2004 agreement, by its structure, never intended to have DirecTV supporting parties practicing this patent. It never intended to give DirecTV have-made rights. It excludes those. In fact, in the 2007 agreement, it specifically says, we acknowledge that you have have-made rights for the things manufactured before December 31st, 2007, because we're giving you that right. But as for things manufactured after that date, specifically in the 2007 agreement, it states that under the continued future use of 3B, that they did not have the right to make any of the covered products going forward. So DirecTV acknowledges by its 2007 agreement exactly the way this 2004 agreement was structured, and that is that what they bargained for and what they received was the ability for their DirecTV supporting parties to receive the ability to make and distribute this equipment with a cap on any future negotiated royalty right or license fee. They did not receive have-made rights. They did not receive distribution rights. They received very limited rights. Counsel, do you concede that the sale of the single-wire technology to DirecTV, it was an authorized sale of a patent item. Do you concede that when you have that type of a sale that it terminates all rights to that item? To DirecTV. If DirecTV wanted to-the question you're really begging, I think, begs the question, if DirecTV wanted to go out itself and set up a plant and manufacture this equipment, would it have the right to do so? That's never been what they do. That's never been a fact in this case. But the 2004 agreement specifically said, because the parties knew that DirecTV was not in that business, DirecTV was in the business of having others manufacture the equipment for them, that they define these DirecTV supporting parties. And they said if these DirecTV-the way you're doing business- Give me the answer to the question, both mine and yours. That DirecTV may have, and I would want to think about it further, but they may have the ability to go out and find a piece of ground and build a plant and start making this stuff under the 2004 agreement. But that's not what they do. That was never- So you have an authorized sale of a patent item. Doesn't that terminate the rights? There was never an authorized sale of a patent item in this case, because DirecTV went to a supporting party, a manufacturer, and had them create it unlicensed. No, I'm referring to the sale between Global Communications and DirecTV. There was no sale of equipment between Global Communications and DirecTV. There was a sale of a patented item. To the extent that the single-wire patented items were at one point licensed, the only ones they licensed were those that were manufactured before December 31, 2007. And after that, they specifically said, we're not selling you have-made rights for anything after that date. And we're reverting back to the 82B provision that says that you need to have a license for your DirecTV supporting parties. Let's hear from Mr. Castanhas. Thank you, Chief Judge Rader, and may it please the Court. Section 8A of the party's 2004 agreement, which is practically identical to the language of the covenant not to sue in trans core, authorized DirecTV to sell components to the defendants in this case. Mr. Castanhas, just kind of dealing first with the more general principle. I presume you wouldn't object if I, as a patentee, spread my royalty rentals throughout various levels of the chain here from distributor to ultimate use. I can get 25% of my royalties at the bottom and then 25 and 25 and 25 if I wish. I think there are ways to structure an agreement in which you limit the use. Okay, good. But that's not what we have here. And now if I have spread my rentals throughout various levels of the chain and I settle with you at the top, how do I preserve my right to continue to collect my royalties from those who are still infringing and using down below? Well, one of the things you would not do is give me an unqualified right to sell. And that's what 8A did here, and Judge Toronto had it exactly right. Those authorized sales, which are, 8A is not ambiguous with regard to DirecTV's right to sell, exhausted Global's right to the single wire patents under Quanta, under Univis, and under this court's decision in trans core. Can I just ask? I'm not sure I fully understood what I think I'm hearing from the other side this morning, which is that there's an inquiry that's necessary about how particular pieces of equipment got into DirecTV's hands. That DirecTV is maybe authorized to sell stuff of its own, but that exhaustion doesn't cover a situation where that seller has not been authorized to acquire what it in turn sells. Are there cases that talk about the upstream of the supposedly authorized seller? The only cases I'm aware of, Judge Toronto, in that area are the have-made cases, which presume that a grant of the right to make also is implied to include a have-made right, unless there's clear evidence to the contrary. That's this court's decision in core brace. But do any of those cases say that having a have-made right is necessary in order to exhaust the rights for what you then sell? No, and in fact, that's really where my friend on the other side here is mixing apples and oranges. Whether or not DirecTV had the right to have those products made for it, that's a make right. That's a different set of the bundle of infringement rights. All of these exhaustion cases, many of which come from the late 19th century in the Supreme Court, and then things die out for a while. Do any of them talk about upstream of the seller, of the original seller? None that I can think of off the top of my head, Your Honor. What the cases focus on, what Quanta focused on, what Unibus focused on, and what TransCorp focused on, is the right of the licensee or the covenantee, in the case of DirecTV in this case, to sell. It's that one right to sell. That's unequivocal, as you yourself got out of my opponent, or at least I think you got out of my opponent, that DirecTV can sell, and that 8A provision is unambiguous. And to the point that there is some type of licensing requirement downstream that's required. I think I'd point you to the Supreme Court's decision in Quanta where a very similar argument was made that because third parties, whether or not third parties received implied licenses, was set by the Supreme Court to be irrelevant because the right was to practice the patents not on implied license but on exhaustion. I'm not sure, but there wasn't an argument in Quanta that what Intel was selling when it was selling its chips somehow, that there was no argument that Intel was getting those from somebody else, that it was not authorized to sell them. I don't think that argument was made in that case, and I don't think it would have worked in that case even if it had been the facts of the case, because it all turns on the licensee's right to sell. And whether or not DirecTV had the right to have these products made, and I need to point out to you that there is another case pending that my friends here have brought against DirecTV and certain John Doe upstream manufacturers claiming a violation of these patents for making those. So this whole notion of had-made rights can be litigated in the context of that case. That's a pending decision on our motion for the DirecTV and the manufacturers' motions for judgment on the pleadings. Can I ask you a question? I know your brief talks a little bit, and some of the cases talk, I'm not entirely sure why, but they do, about this notion that exhaustion is supposed to guarantee that the patent owner gets no more than one full payment. However, I have no idea how one would measure that, but let's assume one can. And I look at the dollar amounts in the 2004 and 2007 agreements here, and I won't say what they are, but is it plausible that those dollar amounts really give one full payment for this seemingly extraordinarily important aspect of DirecTV's business? Well, I think the answer is that if this case were to go farther down the road, you would find that they aren't seemingly important at all. The ability of different TVs in the house to have different programs on? I mean, that would be really important in my house. But, well, as a general proposition, that might be the case. But, again, there is no patent claim that is before this Court right now. We're here at the threshold issue of exhaustion. And I can tell you a little bit about the background of that agreement, and that is that the value that was given in that license agreement was not going to be available to my friends on the other side simply for that 930, I think it was, patent. The single wire patents were a very important part of getting the value that they got out of that. And with regard to a couple of the other... I'm going down a line that you didn't want to go down. Let's go back to it. We have the understanding that I can spread my royalty rentals throughout various levels of the chain. In this instance, you don't want to deal with the hypothetical. We'll deal with this one. If one of the downstream users refuses to take a license, what's supposed to happen? If one of the downstream... Under this agreement, what did the parties agree would happen if a downstream user did not take a license? So to help you understand my answer to that, I'd refer you to the schematic drawing that we have at page 6 of the red brief, which shows that these components sometimes are sold directly by DirecTV or sometimes are purchased directly from the manufacturer. And so the 2007 agreement is a good example of that, of that so-called spreading, because what that provision, what that 8B2 provision then allows for is in cases where there is a... You just want to deal with the direct sales. I want to deal with the chain. Okay, so you want to suggest that we're sticking with the West Side. No, I'm not suggesting anything. I'm saying what did the parties agree, and they couldn't have missed this. I mean, this has to be the fundamental thing on their mind when they're writing this agreement. What happens when one of these people downstream don't take a license? Well, if we're dealing with, again, the going through DirecTV and the products are sold by DirecTV, then there is no requirement for anybody at the distributor level to purchase a license. That's exactly the point of the... Why did they talk about all that in B2 then? So if I could, again, refer the court back to that schematic at page 6 of our brief. There are two paths through which product may get to the distributors. One is through DirecTV. Those are exhausted sales under 8A. Stick with my point. Okay. You cannot have failed to consider what is going to happen if one of the people down chain do not take a license. Right. What did you decide to do in that case? Well, then, DirecTV decided that it would purchase a license under which... I'm sorry? It decided under your theory to give those things away because they didn't... There's nothing in B in your mind that addresses that subject at all. B is addressed to the situation where there is no license and no exhaustion. That's what the 2007 agreement did. It paid... So you're saying they didn't consider and there was no agreement whatsoever on what happens if someone down chain from DirecTV refuses to take a license. No, they did consider that, but that's what the 2007 agreement, in fact, ended up being. That was DirecTV buying a license for the distributors for a product that was not exhausted. They paid an additional amount of money. Again, I won't disclose that in open court, but that's the right side of our... That didn't go through the left side of your case. Correct. I had thought that it was significant, and I guess I'm just remembering Quanta and LG. This agreement was written before Quanta. My impression was that something very like this was, in fact, part of the agreement in LG, Quanta. And the parties were essentially betting on what the background exhaustion law would turn out to be. It was not really clear. Quanta, the Supreme Court reversed this court in that. And so the 8B provisions cover the right-hand side of the chain where stuff doesn't go through DirecTV, but they also cover the possibility that maybe exhaustion law would remain what it was before the Supreme Court decided Quanta. Sure, it could have, but in fact that's not what it was. And it's now become maybe not completely inapplicable to anything in the real world, but since DirecTV presumably can... Are you saying then that Quanta actually says there's no way, once you've entered into a settlement agreement at the top level, there's no more way for me to spread royalties throughout the different levels? I think so long as you have granted a... Do you read Quanta that sweepingly? I read it... Because the Qualcomm brief, which had a very narrow, which had a way to do it, is perceived in the licensing community as a continually valid way to spread your royalties while reaching an agreement at the top level. I think that if, and I can't speak to the Qualcomm brief right here... You need to go back and get it, because that's what the licensing community is relying on extensively. But I cannot believe that after Quanta, that if an agreement, as 8A did in this case, gave an unqualified right to sell, an unambiguous, unqualified, forever refrained from any lawsuit, any kind and character, in whole or in part right to sell, that there is some way to then go after the purchasers of those sold products. That's exactly what Quanta said was irrelevant, and that's the term the Supreme Court used, irrelevant. That's exactly what this court said when, in Transport, Transport tried to rely on peril evidence... Qualcomm essentially says, if the people to whom, in this fact situation, DirecTV sells have a license with DirecTV, that license will be covered. If they don't, they will not be covered. If they refuse a license, a sub-license, then they're going to have to reach a separate agreement with the patent owner. I cannot believe, Chief Judge Rader, that if DirecTV, in that hypothetical, has an unqualified right to sell, as DirecTV does here in 8A, that that would not exhaust the downstream sales. That's exactly what this court in Transport... And there may be a way to do it, but I wasn't before, by the way, trying to resist your hypothetical. I was trying to point out that when there is an unqualified grant of a right to sell, that's the end of the game. Again, I think Judge Taranto summarized it very well. That's really the end of the game here. In my remaining time, let me just address a couple of things. I think I've already addressed the arguments made about the 2007 agreement. The 2007 agreement acts exactly as I've explained it. The term laundering that's been used here, that's a very useful pejorative term, but it only reflects exactly what DirecTV was entitled to do here, which was to sell to the defendants in this case under 8A in an unqualified way. And I finally just remind the court that the half-made rights issue, which has been raised here, does not have anything to do with DirecTV's right to sell and the exhaustion of the rights by that right to sell. And that's going to be litigated in the case that's pending right now. If the court has further questions, I'll give my last five seconds back to the court. Thank you, Mr. Gastonius. Very generous. Mr. Burns. In addressing the question of what did DirecTV and the DirecTV supporting parties have a right to do if one of them decided they did not want to take a license, the answer is that DirecTV could purchase a license for them because DirecTV did not have an unrestricted essentially license through this covenant not to sue because you have to read 8A and 8B together. So the fact that DirecTV got up and purchased a license in 07 and you have to read that together with 8B to see what If you had given me the Qualcomm language, and in the event they have a sublicense, we will honor that sublicense, otherwise they have to get one from us. You didn't say that, did you? That was not said in the agreement because Qualcomm came about several years later, and they may have actually traced that language had they had the benefit of having the Qualcomm decision. So these are parties before Qualcomm trying to architect something that is a carve-out, and this is the language they came up with to try to effect that result. Thank you. And I would like to put, there is nothing in the record that would suggest that the equipment, one way or the other, the 07 equipment was either purchased through DirecTV or directly from a manufacturer to a distributor. There is no evidence in the record as to the route that that equipment... I thought that was extrinsic evidence. Thank you very much. All rise. The Honorable Clause's adjournment until tomorrow morning at 10 a.m.